O
JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GG CAPITAL, et al. | CASE NO. SACV 12-02213-JLS (RNBx) |
| Plaintiffs, | |
| vs. | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| DEUTSCHE BANK AG, | |
| Defendant. | |

Before the Court is a Motion to Dismiss filed by Defendant Deutsche Bank AG. (Mot., Doc. 51.) Plaintiffs GG Capital; PTC-A, LLC; JFP III, LLC and PTC Investments, LLC opposed the Motion, and Defendant replied. (Opp'n, Doc. 52; Reply, Doc. 54). Having read the parties' briefing and taken the matter under submission, the Court GRANTS Defendant's Motion.

## I. BACKGROUND

Plaintiffs bring claims for negligent misrepresentation and fraud against Defendant, based on Defendant's alleged representations in 2000 and 2001 to Plaintiffs regarding investments Plaintiffs made through Defendant. Plaintiffs allege that Defendant's disclosures in a 2010 Non-Prosecution Agreement contradict its earlier representations. The following background describes the investments, the representations allegedly made with respect to the investments, pertinent facts regarding the statute of limitations and the discovery rule, and the relevant contents of the 2010 Non-Prosecution Agreement.

### A. Investments at Issue

In February 2001, Plaintiffs agreed to purchase several long options on Japanese Yen from Defendant. (First Amended Complaint ("FAC") ¶¶ 11, 21-24, Ex. A, Doc. 43.) Plaintiffs purchased a total of 21 long options, either directly from Defendant in February 2001 or later from other entities that had purchased the options from Defendant. (*Id.* ¶¶ 21, 24, Ex. A.)

Pursuant to the terms of each of the purchased options at issue, the buyer of the long option would pay an option premium. (*Id.* ¶ 13.) To finance the premium, the buyer would sell a corresponding short option on Japanese Yen to Defendant, which also included an option premium payable by Defendant. (*Id.* ¶¶ 12, 17.) The option premium on the long option was greater than the option premium on the

associated short option, such that netting the two premiums for each option pair resulted in a premium payable to Defendant. (*Id.* ¶ 18-A.)

At the expiration of a given option period, if the exchange rate equaled or exceeded the strike price for an option, the party that sold the option would pay the party that bought the option a set amount; if the exchange rate did not equal or exceed the strike price for an option, the party that bought the option received nothing. (*Id.* ¶¶ 14-16.) The fixed potential payout for a long option was greater than the fixed potential payout for the associated short option, meaning if both options were "in the money," a net payout would be payable to the buyer of the long option. (*Id.* ¶ 18-B.)

The strike price for the long option was set two pips[1] lower than the strike price for the short option. (*Id.* ¶ 18-C.) Thus, if the strike price fell within the two-pips spread, then only the long option was "in the money," and the buyer of the long option would receive a much higher net payout. (*Id.*) The two-pips spread was referred to as the "sweet spot." (*Id.*) As discussed below, based on representations that Defendant made to Plaintiffs, for the majority of the option pairs the probability that a particular pair would hit the "sweet spot" was approximately 0.051%. (*Id.* ¶ 19-B.)

### B.  Defendant's Representations in 2000 and 2001

The investments were made following a telephone call on July 10, 2000 and a meeting in February 2001 between Perry Parker, an analyst for Defendant, and David B. Greenberg, on behalf of Plaintiffs. (*Id.* ¶¶ 8, 19, 20, 21.)

---

[1] A "pip" is 1/100 of a Japanese Yen. (*Id.* at 5 n.1.)

During the call and meeting, Parker allegedly made several representations to Greenberg regarding the investment, which Plaintiffs allege were later revealed to be false. The representations were:

1. "The premium that would be paid for each long option and the premium that would be paid for each short option was the approximate theoretical Black-Scholes value for each option." (*Id*. ¶ 19-A.)
2. "With respect to each of the paired long and short options, there was an actual possibility of hitting the 'sweet spot'; that the probability was low, but that it could be calculated by *subtracting*: 1) the Black-Scholes probability of the short option ending up in-the-money; 2) *from* the Black-Scholes probability of the associated long option ending up in-the-money. Based on that representation, probability of hitting the sweet spot (which varied by option pair) was 0.091% . . . with respect to one option pair and approximately 0.051% . . . with respect to more than half of the option pairs." (*Id*. ¶ 19-B) (emphasis in original).[2]
3. "If the 'sweet spot' did hit, [Defendant] would pay the value of the sweet spot." (FAC ¶ 19-C.)
4. "Each of the paired long and short option structures would be a standard option structure that was used with other investors, including other investors who were not claiming any tax benefits with respect to the options." (*Id*. ¶ 19-D.)

---

[2] The representations alleged in Plaintiffs' Complaint differ from those alleged in its First Amended Complaint. For example, according to the Complaint, the representations included that (1) "there would be *a possibility* hitting [sic] the 'sweet spot,'" and (2) "the sweet [sic] probability (which varied by option pair) *was as high as .051% . . . .*" (Compl. ¶ 13-B, Doc. 1) (emphasis added).

4

5. "[Defendant] would consider each of the paired long and short options to be two distinct options." (*Id.* ¶ 19-E.)
6. "[Defendant] would price each of the paired long and short options as two distinct options (i.e., [Defendant] would calculate the premiums for each long option and each short option separately)." (*Id.* ¶ 19-F.)
7. "[Defendant], internally, would account for each of the paired long and short options as two distinct options." (*Id.* ¶ 19-G.)
8. "[Defendant] would act as the 'calculation agent' with respect to each option pair, meaning that [Defendant], acting on behalf of itself and Plaintiffs, would calculate (or determine) the Yen-per-Dollar exchange rate at the end of each option period. In making this determination, [Defendant] would be determining, on behalf of the parties, whether the sweet spot of each option pair had been hit." (*Id.* ¶ 13-H.)
9. "[Defendant] would 'act in good faith' and in accordance with the rules of International Swaps and Derivatives Association, Inc. ('ISDA') in [Defendant's] capacity as the calculation agent." (*Id.* ¶ 13-I.)

The Court refers to the representations made in these meetings collectively as the "Original Representations." As explained below, Plaintiffs' allegations of fraud focus on Defendant's representations regarding the sweet spot. (*See* FAC ¶¶ 29, 32.)

### C. Events and Disclosures Following the Original Representations

In January 2005, Greenberg petitioned the IRS on behalf of GG Capital regarding tax deductions claimed in connection with the paired option investments at issue. (FAC ¶ 31-B; Opp'n to First MTD RJN at 6, Doc. 23-1.)

On October 28, 2008, Greenberg filed a motion in limine in a criminal tax case brought against him by the United States. (*See* FAC ¶ 30; MTD RJN Ex. 20, Doc. 51-4.)[3] Greenberg's motion referred to a tax strategy implemented by his clients involving the type of investments described above. (MTD RJN Ex. 20 at 8-9.) In discussing the tax strategy and underlying investments, the motion characterized grand jury testimony by Perry Parker—the same analyst who made the Original Representations—as "a discussion that *the bank chose not to hedge the sweet spot risk* because it was small and impractical to hedge." (*See* FAC ¶ 30; MTD RJN Ex. 20 at 9 n.13 (emphasis added).) The motion also quoted Parker's testimony that hitting the sweet spot "was a real possibility. It was a real risk. It was just a very small risk." (FAC ¶ 30-C; MTD RJN Ex. 20 at 9 n.13.)[4]

At Greenberg's trial, an attorney for the federal government told the judge that "there is a claim that these options are in fact separate options, [that] they are not paired," and therefore it was important that an analyst for Defendant testify that "if the bank was asked to do these as separate trades as opposed to paired, they would require the person requesting to do these separate options to pony up a lot of collateral." (MTD RJN Ex. 21 at 1751:18-25; *see also* FAC ¶ 30-B.) Consistent with the attorney's representation, the analyst testified that Deutsche Bank required

---

[3] The Court notes that Defendant requests judicial notice of numerous documents that may be relevant to the statute of limitations and the discovery rule. While Plaintiffs have failed to address most of these documents, the Court nonetheless declines to take judicial notice of documents that are not referenced in the First Amended Complaint. Accordingly, the Court takes judicial notice only of the motion in limine and the trial transcript. (MTD RJN Exs. 20, 21); *see Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds in Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). The Court takes judicial notice of these documents for the existence of the statements made therein, not for the truth of the matters asserted. *Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001).

[4] The version of the testimony quoted in the First Amended Complaint omits the sentence, "It was a real risk."

full collateral with respect to the bank's "net exposure" on the long and short options considered together, rather than with respect to each option considered individually, and that, at least with respect to risk management, the paired options would not be treated separately. (*See* FAC ¶ 30-B; MTD RJN Ex. 21 at 1774:24-1775:14.) The same analyst testified that Deutsche Bank "broadly" referred to paired option investments as "tax transactions." (MTD RJN Ex. 21 at 1818:23-1819:10.)

**D.     Disclosures in Defendant's 2010 Non-Prosecution Agreement**

On December 21, 2010, Deutsche Bank entered into a Non-Prosecution Agreement and accompanying Statement of Facts ("NPA"), which Plaintiffs attach to the First Amended Complaint. (*Id.* ¶ 28, Ex. B.) According to Plaintiffs, by virtue of certain excerpts in the NPA (which refer to the options as "FX Digital Options"), Defendant "admitted the falsity" of the Original Representations. (*Id.* ¶ 29.) The excerpts cited by Plaintiffs, and the relevant context for the excerpts, are:

1. "[Defendant] participated in approximately 15 different tax shelters . . . and implement[ed] over 2,300 financial transactions. These tax shelter transactions included (among others): . . . 474 FX Digital Options transactions . . . ." (FAC ¶ 29-E; NPA ¶ 5.)
2. "[Defendant's] personnel created the individual paired options structures for specific use in tax shelter transactions." (FAC. ¶ 29-A; NPA ¶ 19.)
3. "Certain [of Defendant's] employees understood that: . . . FX Digital Options . . . were designed to generate tax losses based on long and short option positions; the transactions involved offsetting and paired options that netted out to a relatively small long option position." (FAC ¶ 29-B; NPA ¶ 19(a).)

4. "The long and short legs of any given pair were priced as if they were one unified transaction." (FAC ¶ 29-C; NPA ¶ 23.)

5. "In reverse engineering the options to fit the parameters required for the tax loss, [Defendant] calculated premiums for both the long leg of the transaction being purchased by the taxpayer and the short leg of the transaction being purchased by [Defendant] that were, in many cases, significantly above the theoretical Black-Scholes value of the options being purchased and that provided a 1% net premium for [Defendant]." (FAC ¶ 29-D; NPA ¶ 23.)

6. "The FX Digital Options and COBRA transactions were structured with a supposed 'lottery payout' potential—that is, many customers were told that there was a chance, albeit an extremely remote one, that the options could result in a very large profit if on the measurement day the underlying currency valuations happened to hit within what was typically a two 'pip' difference . . . . Virtually all of the DB FX Digital Options and COBRA transactions had a 2-pip spread, and the area within the spread was referred to at times as the 'sweet spot.' As [Defendant] knew, there was virtually no chance that the sweet spot would be hit, and in fact it was not hit in any of the transactions that [Defendant] executed. In fact, [Defendant] did not hedge for that possibility and ultimately recorded the option spreads in its internal risk management system as having a zero pips spread." (FAC ¶¶ 29-B, E; NPA ¶ 24.)

Plaintiffs' allegations of fraud focus on the final two sentences in the sixth paragraph above. (FAC ¶¶ 29, 32.) Plaintiffs allege that these two sentences demonstrate there was no possibility of hitting the sweet spot, and thus Defendant defrauded Plaintiffs out of any potential sweet spot payout. (*Id.*) Plaintiffs do not allege that any option pairs actually hit the sweet spot. (*Accord* NPA ¶ 24.)

**E.     Present Action**

Plaintiffs filed the present action on December 26, 2012.  (Compl., Doc. 1.)  Plaintiffs bring claims for fraud and negligent misrepresentation, and seek to recover the premiums they paid for the investments.  (Compl. at 9-12; FAC at 15-18.)  Defendant filed a motion to dismiss, and the Court held a hearing on the motion.  (Hr'g Tr., Doc. 33.)  At the hearing, the Court expressed its concerns about the plausibility of Plaintiffs' claims, as well as whether the claims were barred by the statute of limitations.  (*Id*. at 7:5-9.)  On September 16, 2013, the Court dismissed the Complaint without prejudice, finding that Plaintiffs had not alleged sufficient facts to demonstrate that the statute of limitations should be tolled.  (Order at 8-9, Doc. 39.)  After the Court held the hearing on the motion, but before the Court issued its order, Plaintiffs moved for leave to amend.  (Doc. 31.)  The Court struck the motion for leave to amend after issuing its order dismissing the claims without prejudice.  (Doc. 40.)  Plaintiffs then filed a First Amended Complaint, which is the operative pleading.  (Doc. 43.)  Defendant moved to dismiss the First Amended Complaint for largely the same reasons it moved to dismiss the Complaint.  (Mot.)

## II.   LEGAL STANDARD

When evaluating a Rule 12(b)(6) motion, the Court must accept as true all allegations of material facts that are in the complaint and must construe all inferences in the light most favorable to the non-moving party.  *See Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994).  Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  A complaint must (1) "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  "Although for the purposes of a motion to dismiss [the Court] must take all of the factual allegations in the complaint as true, [it] '[is] not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Moreover, "where a complaint includes allegations of fraud, Federal Rule of Civil Procedure 9(b) requires more specificity including an account of the 'time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)).  "A pleading is sufficient under rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).

In considering the motion, the Court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially noticeable and "documents whose contents are alleged in a complaint and

1  whose authenticity no party questions, but which are not physically attached to the
2  pleading." *Branch*, 14 F.3d at 453-54.

### III. DISCUSSION

Defendant moves to dismiss Plaintiffs' First Amended Complaint on the grounds that (1) Plaintiffs' claims are time-barred under the statute of limitations; (2) Plaintiffs do not plausibly allege misrepresentations; and (3) Plaintiffs allegedly signed express disclaimers of reliance with Defendant and therefore cannot claim to have relied on the Original Representations. (Mem. at 12, 21, 24, Doc. 51-1.) The Court previously dismissed Plaintiffs' Complaint for failure to allege how the claims were not time-barred, noting it "is not clear that Plaintiffs even *could* plead facts showing an inability to have made earlier discovery despite reasonable diligence." (MTD Order at 8 (emphasis in original), Doc. 39.) At the hearing on the motion to dismiss the Complaint, the Court also identified issues with the plausibility of Plaintiffs' allegations. Plaintiffs' First Amended Complaint does not adequately address these issues, and the Court finds that Plaintiffs' claims are both time-barred and not plausible. As such, the Court does not address Defendant's third argument for dismissal.

Plaintiffs bring claims for fraud and negligent misrepresentation. (FAC at 15, 17.) Under California law, a claim of fraud requires "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Helicopter Co. v. Dana Corp*, 34 Cal. 4th 979, 990 (2004) (citations omitted). A claim for negligent misrepresentation requires "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting

11

damage." *Wells Fargo Bank, N.A. v. FSI, Fin. Solutions, Inc.*, 196 Cal. App. 4th 1559, 1573 (2011) (citations and quotation marks omitted). Both of these claims are subject to a three-year statute of limitations under California law.[5] (*See* MTD Order at 7.)

Because these events occurred more than three years before the Complaitn was filed, Plaintiffs rely on the "discovery rule" to toll the statute of limitations for their claims. (*See* FAC ¶¶ 30-32; Opp'n at 1, 10-16.) Under the discovery rule, "[t]he cause of action in [a] case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." Cal. Code Civ. Proc. § 338(d). For the rule to apply, Plaintiffs must "specifically plead facts to show (1) the time and manner of discovery [of facts constituting the fraud] and (2) the inability to have made earlier discovery despite reasonable diligence." *Canas v. Citimortgage*, *Inc.*, No. SA CV 13-0322-DOC, 2013 WL 3353877, at *3 (C.D. Cal. Jul. 2, 2013) (citations omitted).

"The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action. The discovery rule does not encourage dilatory tactics because plaintiffs are charged with presumptive knowledge of an injury if they have information of circumstances to put [them] on inquiry or if they have the opportunity to obtain knowledge from sources open to [their] investigation." *Fox v.*

---

[5] The parties previously briefed whether New York law or California law applies to Plaintiffs' claims. The Court analyzed the parties' claims under California law (which was also the law requested by Plaintiff). (Order at 6.) Plaintiffs' claims fail under New York law for the same reasons they fail under California law. Claims for fraud and negligent misrepresentation under New York law require a misrepresentation or "incorrect or false" information. *See Colasacco v. Robert E. Lawrence Real Estate*, 68 A.D.3d 706, 708-09 (Ct. App. 2009). Likewise, New York's limitations period for fraud is the greater of six years from accrual, or "*two* years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." N.Y.C.P.L.R. § 213(8) (emphasis added).

*Ethicon Endo Surgery, Inc*., 35 Cal. 4th 797, 807-08 (2005) (emphasis omitted). Under the rule, "suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period." *Id.* at 807.  Accordingly, a plaintiff is on inquiry notice when "he at least suspects . . . that someone has done something wrong to him, 'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding.'" *California ex rel. Metz v. CCC Info. Servs., Inc*., 149 Cal. App. 4th 402, 418 (2007). "Such reasonable suspicion exists when the plaintiff has notice or information of circumstances to put a reasonable person on inquiry . . . ." *Id*. In addition, "[i]t is not too much of a stretch to expect a . . . knowledgeable executive[] to extrapolate from his . . . knowledge of one cause of an injury . . . that there might be other concurrent causes . . . ." *Czajkowski v. Haskell & White, LLP*, 208 Cal. App. 4th 166, 178 (2012).

The Court first addresses the two disclosures in the NPA that have been identified as material to Plaintiffs' damages claims—(1) "there was virtually no chance that the sweet spot would be hit" (FAC ¶¶ 29-E, F); and (2) Defendant had "recorded the option spreads in its internal risk management systems [RMS] as having a zero pips spread" (*id*. ¶ 29-B)—followed by the remaining disclosures. (*See* Hr'g Tr. 3:21-4:1; *see also* FAC ¶¶ 29, 32.)

### A.     Disclosure of "Virtually No Chance"

Plaintiffs contend the disclosure that "there was virtually no chance that the sweet spot would be hit" plausibly contradicts the statement in the Original Representations that the probability of hitting the sweet spot was "low"— approximately 0.051% for the majority of the option pairs. (FAC ¶¶ 19-B, 29-E.) To the extent the NPA states that the sweet spot for any given option pair had

virtually no chance of hitting,[6] it does not plausibly contradict the Original Representations. As Plaintiffs knew of essentially the same facts when they entered into the transactions, claims premised on this disclosure would also be time-barred.

Plaintiffs have amended their pleading to suggest that the same "virtually no chance" language means that the *combined* odds that *any* of the hundreds of option pairs sold to *anyone* would hit was "virtually no chance," when there allegedly was approximately a 20% chance that one of those hundreds of option pairs would hit the sweet spot. (FAC ¶¶ 29-E-F, 32-A; Opp'n at 17.) However, this is not what the NPA says. As is clear from the context of the statement provided in the Background section, the NPA discusses how the individual option pairs worked, including what it meant for an option pair to have a "sweet spot." The "virtually no chance" language refers to the odds of a particular option pair hitting the sweet spot. It does not refer to the combined probability that one of the hundreds of option pairs would hit the sweet spot. (NPA ¶ 24.) Accordingly, Plaintiffs' interpretation is not plausible.

### B.  Disclosure of "Zero Pips Spread"

According to Plaintiffs, the disclosure in the NPA that Defendant recorded a zero-pip spread in its internal risk management system meant that Defendant "had to have made the internal decision to exercise its discretion as the calculation agent such [sic] a way that it would never have to pay out the sweet spot." (FAC ¶ 32-E.) As a result, when Defendant made the Original Representations, it allegedly "knew there was no possibility that any of the Plaintiffs would ever hit the sweet spot." (*Id.*)

---

[6] Plaintiffs' Complaint and First Amended Complaint both offer this interpretation of the statement. (Compl. ¶ 29-E; FAC ¶ 29-E.)

Nothing in the NPA suggests that by recording a zero-pip spread in its internal risk management system, Defendant would not have calculated the sweet spot properly or paid out the sweet spot if it hit. (*See* NPA ¶ 24; FAC ¶ 32.) In addition, Plaintiffs recognize that recording a zero-pip spread was how Defendant chose not to hedge for the risk of the sweet spot hitting, (Hr'g Tr. at 4:11-20), and Plaintiffs have taken the position that the decision not to hedge is "irrelevant" to their claims. (Opp'n at 3, 11; Hr'g Tr. at 5:21-23, 6:5-9; FAC ¶ 30-A.)[7] In light of Plaintiffs' insistence that Defendant's decision not to hedge told Plaintiffs nothing whatsoever, the simple fact that Defendant chose not to hedge for the risk by recording a zero-pip spread in its internal risk management system does not "nudge[] [Plaintiffs'] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In the alternative, if the disclosure of the zero-pip spread plausibly demonstrates a material misrepresentation, then Plaintiffs had inquiry notice of claims based on the disclosure.[8] Greenberg knew of the decision not to hedge by at least 2008. Considering the context of that disclosure, as well as the other events described in the Background section, Plaintiffs were on inquiry notice of their claims more than three years before the Complaint was filed. *See Metz*, 149 Cal. App. 4th at 418; *Czajkowski*, 208 Cal. App. 4th at 178-79.

---

[7] Plaintiffs took this position only after Defendant provided evidence that Plaintiffs knew of the decision not to hedge more than three years before the Complaint was filed.

[8] In general, Plaintiffs' arguments that prior disclosures did not even put them on inquiry notice of their claims undermine their arguments as to the materiality of disclosures in the NPA, and likewise their arguments as to the materiality of the disclosures in the NPA undermine their arguments that prior disclosures did not even put them on inquiry notice of their claims.

### C. Other Disclosures

At the hearing on the first motion to dismiss Plaintiffs identified as material only the representations as to the sweet spot and the disclosure regarding the zero-pip spread. (Hr'g Tr. at 3:21-4:1; *see also* FAC ¶¶ 29, 32.) Plaintiffs did not identify any other disclosures, including any regarding the use of the paired options for tax purposes or the paired treatment of the options. Nor could such disclosures be material, as they do not relate to whether the sweet spot would be paid out if it hit.

Regardless, the use of paired options in tax shelters was disclosed at Greenberg's trial more than three years before the Complaint was filed. As to the pricing of the option pairs and the calculation of premiums, given the testimony at Greenberg's trial regarding the separate treatment of the paired options, as well as the context of the testimony and the other events described in the Background section, Plaintiffs were on inquiry notice more than three years before the Complaint was filed.

### D. Dismissal with Prejudice

At the hearing on the first motion to dismiss, the Court raised issues with the plausibility of Plaintiffs' claims and the statute of limitations. (Hr'g Tr. at 5:7-9, 5:24-6:4, 7:1-10.) Plaintiffs' First Amended Complaint does not cure these problems, and Plaintiffs' Opposition largely repeats arguments made in prior briefing and at the hearing. Accordingly, the Court finds that further amendment would be futile, and therefore dismisses the claims with prejudice.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion is GRANTED and Plaintiffs' claims for fraud and negligent misrepresentation are DISMISSED WITH PREJUDICE.

**SO ORDERED**

DATE: April 28, 2014  _____
JOSEPHINE L. STATON
JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE